IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

TIM R.,

Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

4:25CV3120

MEMORANDUM AND ORDER ON
JUDICIAL REVIEW OF
COMMISSIONER'S DENIAL OF
BENEFITS

Plaintiff Timothy R.[1] seeks judicial review of the denial of his application for Social Security Disability Insurance benefits by the defendant Commissioner of the Social Security Administration. Filing 1 at 1. Timothy R. has moved for an order reversing the Commissioner's decision. Filing 17. In response, the Commissioner filed a motion to affirm the Commissioner's final decision denying disability benefits. Filing 20. For the following reasons, the Court grants the Commissioner's Motion to Affirm and denies Timothy R.'s Motion to Reverse.

## I.  INTRODUCTION

### A.  Procedural Background

Timothy R. applied for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., on August 15, 2022. Filing 9-5 at 2-3 (AR 195-196). Timothy R. alleged a disability onset date of June 1, 2022. Filing 9-5 at 2 (AR 195). The Social Security Administration (SSA) denied Timothy R's claim initially on March 10, 2023. Filing 9-3 at 2 (AR 71). Upon reconsideration, his claim was again denied on October 6, 2023. Filing 9-3 at 12 (AR 81).

On October 16, 2023, Timothy R. requested a hearing by an Administrative Law Judge (ALJ) to review the determination of the SSA pursuant to 20 C.F.R. §§ 404.929 et seq., and

---

[1] The Court will refer to Plaintiff by first name and last initial to protect his privacy.

416.1429 *et seq.* Filing 9-4 at 30-31 (AR 118-119). The ALJ held an in-person hearing with Timothy R. on April 25, 2024, to review the denial of his applications. Filing 9-2 at 44 (AR 43); Filing 9-4 at 54 (AR 142). On May 21, 2024, the ALJ issued a ruling in favor of the Commissioner, denying Timothy R.'s claim for disability insurance benefits. Filing 9-2 at 21-36 (AR 20-35). On May 6, 2024, Timothy R. submitted a request to the SSA Appeals Council for review of the ALJ's decision. Filing 9-4 at 105-106 (AR 193-194). The SSA Appeals Council denied Timothy R.'s request for review on May 21, 2024. Filing 9-2 at 2-4 (AR 1-3). Timothy R. filed this action on April 17, 2025, seeking judicial review and requesting that this court find in his favor or remand the case for a further hearing and award attorney's fees. Filing 1 at 1-2.

## B. Factual Background

### 1. The Claimant and His Alleged Disabilities

Timothy was forty-seven years old at the alleged disability onset date, June 1, 2022, classifying him as a younger individual (age 45-49) pursuant to 20 C.F.R § 404.1563 and 20 C.F.R. § 416.964. Filing 9-2 at 34 (AR 33).[2] Timothy R. is classified as having at least a high school education, which places him in the fourth—and highest—educational ability category listed under 20 C.F.R §§ 404.1564 and 416.964. Filing 9-2 at 34 (AR 33). Timothy R. lives in a house with his wife and has adult children from a previous marriage that do not live with him. Filing 9-7 at 150 (AR 496); Filing 9-6 at 38 (AR 254); Filing 9-7 at 137 (AR 483). Timothy R. appears to have been employed at Baxter Dodge through October, 2022, but in other parts of the record the last date of his employment with Baxter was June 2022. Filing 9-6 at 27 (AR 243); Filing 9-6 at 116 (AR 332). The ALJ found that "[t]he claimant has not engaged in substantial gainful activity since June 1, 2022, the alleged onset date." Filing 9-2 at 26 (AR 25). Timothy R. alleged in his disability report

---

[2] This would have changed by now as Tim R. is now over fifty putting him in the "person closely approaching advanced age" category.

2

that he has diabetes type one with polyneuropathy; he is missing a toe on his right foot (fourth digit); he has lower back pain; and has mental health issues including anxiety. Filing 9-6 at 21 (AR 237).

Timothy R. supports his motion for an order to reverse the Commissioner's decision with two arguments. First, he contends that the ALJ failed to account for each of his impairments and without providing an explanation ignored evidence favorable to him. Filing 17 at 10. Second, Timothy R. contends that the ALJ's RFC determination lacks substantial evidence and made a legal error in finding the State Agency psychological consultants' opinions somewhat persuasive but rejecting them for their ambiguity rather than evaluating their consistency and supportability. Filing 17 at 13. The Court will provide a focused statement of facts based on the medical records and other evidence relevant to Timothy R's challenges to the ALJ's decision.

### 2. Medical Records and Evidence

#### a. Treating Physicians' Opinions of Timothy R.'s Symptoms

The Administrative Record demonstrates Timothy R. presented before varied physicians and medical professionals from 2012 to March 25, 2024, with the bulk of the medical evidence from November 19, 2021, to March 25, 2024. *See generally* Filing 9-3; Filing 9-7. On February 2, 2022, a treating physician noted a "very high suspicion" that Timothy R. had type 1 diabetes. Filing 9-7 at 74 (AR 420). Timothy R.'s type 1 diabetes mellitus (DM1)—complicated by severe polyneuropathy—was confirmed by APRN of endocrinology Krista Patefield on March 4, 2022. Filing 9-7 at 76 (AR 422). Timothy R. has had a weight range of around 175 to 250 pounds between the alleged onset date and the ALJ's hearing. *See e.g.,* Filing 9-7 at 41 (AR 387) (175 pounds), 106 (AR 452) (205 pounds), 137 (AR 483) (250 pounds). Timothy R.'s family practice APRN Emily Jo Walker nevertheless referred to his appearance as "well-groomed and normal weight." Filing 9-7 at 282 (AR 628). Timothy R. has a history of non-compliance with his diabetes treatment

3

that resulted in amputation of the fourth digit of his right toe after an injury and subsequent septic shock. Filing 9-7 at 48 (AR 394).

Timothy R. was examined three times for pain and swelling in his right leg beginning January 19, 2022, and ending February 8, 2022, during which he was instructed to elevate his legs and instructed not to go to work. Filing 9-7 at 30-33 (AR 376-379). During this time, Timothy R. claimed he believed that he was gaining weight and reported that he weighed 180 pounds the previous Friday and was up to 199 pounds the following Monday.[3] Filing 9-7 at 15 (AR 361). On February 1, 2022, APRN Krista Patefield noted a pattern of late-night lows leading to rebounding morning highs in Timothy R.'s blood glucose levels. Filing 9-7 at 74-75 (AR 420-421). On March 4, 2022, Timothy R.'s situation began to improve due to more accurate tracking with the Dexcom G6 and his insulin was changed to a longer-acting insulin. Filing 9-7 at 76, 82 (AR 422, 428).

On and before June 6, 2022, Timothy R.'s blood sugar was severely elevated as a result of snacking most of the day while traveling for his new job, and APRN Krista Patefield recommended switching to an OmniPod insulin pump. Filing 9-7 at 92, 98 (AR 438, 444). After switching to the pump, Timothy R. showed significantly improved blood glucose levels, though he was not "bolusing his pump" as often as he should. Filing 9-7 at 109 (AR 455). On October 11, 2022, Krista Patefield noted that Timothy R. was "doing very well overall" and that she was "extremely happy with his A1c today." However, she noted some lows after boluses, as well as prolonged highs from bolusing right after eating. Filing 9-7 at 112 (AR 458).

Neither the improved A1c nor the gabapentin prescribed to Timothy R. had an effect on his neuropathy, which persisted without improvement. Filing 9-7 at 112 (AR 458). On February

---

[3] Timothy R. self-reported his Friday weight at 180 pounds but this conflicts with the notes from the Nurse Practitioner who stated, "[H]e believes his weight is up, due to the fluid, as he reports he was 180 pounds on Friday however our office noted him at 195 pounds, first thing the *[sic]* morning, and he [is] 199 in office today." Filing 9-7 at 15 (AR 361).

4

14, 2023, Timothy R. continued with improved overall health and better A1c, but his neuropathy persisted, although he claimed he was uninterested in seeing a pain specialist for it. Filing 9-7 at 166, 173 (AR 512, 519). On August 16, 2023, Timothy R. was diagnosed with diabetic ulcers in his eyes, but no treatment was recommended. Filing 9-7 at 185 (AR 531). Timothy R. also reported that his neuropathy was getting worse around this time, but he was still uninterested in seeing a pain specialist for it. Filing 9-7 192-193 (AR 538-539). On November 30, 2023, APRN Krista Patefield noted, "He had a very low blood sugar the night of November 12-13th. Review of pump ran out reveals boluses stacked totaling almost 11 units before this, including a manual bolus of 3.3 units just prior. This significantly low blood sugar has made him fearful to bolus with his pump, so he has bolused less now, and blood sugars have been running much higher since then." Filing 9-7 at 194-195 (AR 540-541). At this time, Timothy R. reported continued worsening of his neuropathy with only slight improvement from the Lyrica he began taking, but the issue persisted, and the greatest relief came from Epsom baths. Filing 9-7 at 194-195, 203 (AR 540-541, 549). Nevertheless, Timothy R. remained uninterested in seeing a pain specialist. Filing 9-7 at 203 (AR 549).

On February 9, 2024, Timothy R. was hospitalized for suspected stroke or Transient Ischemic Attack (TIA). Filing 9-7 at 272 (AR 618). This was followed by a series of "right-sided numbness and weakness . . . a total of 10 spells each lasting approximately 10 minutes followed by a severe headache." Filing 9-7 at 272 (AR 618). On one of these occasion's Timothy R. lost consciousness and "had some twitching or jerking movements according to his wife." Filing 9-7 at 272 (AR 618). After these episodes, Timothy R.'s CT and MRI results on February 12, 2024, were "unremarkable" and he was referred to Bryan Neurology where further testing reported normal heart health. Filing 9-7 at 286 (AR 632); Filing 9-7 at 349-354 (AR 695-700).

Curiously, Timothy R.'s family practice APRN Emily Walker never noted that Timothy R. was nervous or anxious, while his endocrinology APRN Krista Patefield noted that he was anxious on every visit. Filing 9-7 at 3-4 (AR 349-350), 10-11 (AR 356-357), 16-17 (AR 362-363), 26 (AR 372), 31-32 (AR 377-378), 36-37 (AR 382-383), 41-42 (AR 387-388), 49 (AR 395), 282 (AR 628), 287 (AR 633); Filing 9-7 at 72 (AR 418), 80 (AR 426), 88 (AR 434), 95 (AR 441), 106 (AR 452), 171 (AR 516), 180 (AR 526), 190 (AR 536), 200 (AR 546). This is true even though Timothy R. was examined by both providers at overlapping timeframes. *Id.* On January 31, 2023, Kevin Berryman, the Ph.D. Psychologist who conducted the consultative mental examination for Timothy R., reported that Timothy R. had "no restrictions in his activities of daily living due to mental health concerns." Filing 9-7 at 140 (AR 486). He also reported that Timothy R. did not have difficulty with social functioning, concentration required to complete tasks, understanding instructions and carrying them out, relating appropriately with supervisors or co-workers, or adapting to changes in his environment, managing funds, and that he would not require extra supervision. Filing 9-7 at 140 (AR 486). Kevin Berrymore reported, "There appear to be recurrent episodes of deterioration when stressed, as he will feel anxious." Filing 9-7 at 140 (AR 486). He also noted that Timothy R. reported anger control problems at work in the form of arguing or yelling when reprimanded and anxiety in social situations. Filing 9-7 at 140 (AR 486). He also reported 2 previous panic attacks, but the most recent such event was six years before the consultation. Filing 9-7 at 140 (AR 486). Kevin Berrymore ultimately concluded, "No mental health interventions appear necessary at the time." Filing 9-7 at 140 (AR 486). In both Prior Administrative Medical Findings (PAMFs), state psychological consultants Helen Montoya, PhD, and Rebecca Braymen, PhD, found that Timothy R. had a moderate mental limitation of interacting

with others, but noted that his mental health symptoms were mild in nature. Filing 9-3 at 5-7 (AR 74-76); Filing 9-3 at 15-16 (AR 84-85).

### b.   Timothy R.'s Self-Report

In Timothy R.'s Function reports, he reported being able to feed and watch his dogs as well as do housework a little at a time. Filing 9-6 at 39 (AR 255); Filing 9-6 at 72 (AR 288). Timothy R. reported no problems with personal care, including dressing, bathing, shaving, feeding himself, and using the toilet. Filing 9-6 at 39 (AR 255); Filing 9-6 at 72 (AR 288). He reported being able to prepare his own simple meals (*i.e.*, sandwiches and frozen dinners). Filing 9-6 at 40 (AR 256); Filing 9-6 at 73 (AR 289). He reported being able to do household chores, including laundry, cleaning, and "some repairs." Filing 9-6 at 40 (AR 256); Filing 9-6 at 73 (AR 289). He reported going outside every day and being able to drive and ride in a car. Filing 9-6 at 41 (AR 257); Filing 9-6 at 74 (AR 290). He reported being able to shop by himself for food and having no restrictions in handling money, paying bills, etc. Filing 9-6 at 41 (AR 257); Filing 9-6 at 74 (AR 290). He reported that he watches television and reads books every day and noted that he goes camping "not often." Filing 9-6 at 42 (AR 258); Filing 9-6 at 7 (AR 291). Timothy R. reported that he spends time with others talking "all the time" and that he has no problems getting along with family, friends, neighbors, or others. Filing 9-6 at 42 (AR 258); Filing 9-6 at 75 (AR 291). He also noted that he regularly goes to the store and to church. Filing 9-6 at 42 (AR 258); Filing 9-6 at 75 (AR 291). He reported that he gets along "good" with authority figures. Filing 9-6 at 43 (AR 259); Filing 9-6 at 76 (AR 292). He reported that he does not handle stress well, but he is good at handling changes in routine. Filing 9-6 at 43 (AR 259); Filing 9-6 at 77 (AR 293).

After Timothy R. claimed that his medical condition had changed, he was sent a new functional report. Filing 9-3 at 14 (AR 83). The new report largely matched the first one but had the following changes: Timothy R. now said that his daily activities included showering, playing

video games, and cooking. Filing 9-6 at 72 (AR 288). He added mowing to his list of household chores that he was able to do, but he mentioned that he had to complete this task a little at a time. Filing 9-6 at 73 (AR 289). He reported going outside sometimes rather than every day. Filing 9-6 at 74 (AR 290). He removed camping from his hobbies. He changed talking with others "all the time" to "sometime" but maintained that he had no problems getting along with others. Filing 9-6 at 75 (AR 291). He added car races to the list of places that he goes on a regular basis. Filing 9-6 at 75 (AR 291). He explained that he now "gets along ok" with authority figures, even though he did not work for the period between the reports. Filing 9-6 at 76 (AR 292). He maintained not being able to handle stress well, but he changed his answer to a question about changes in routine to "ok." Filing 9-6 at 77 (AR 293).

### 3. *The ALJ's Hearing*

On April 25, 2024, the ALJ held a hearing to review the Commissioner's denial of Timothy R.'s application for disability insurance benefits. Filing 9-2 at 42 (AR 41). Timothy R. appeared at the hearing, represented by his attorney. Filing 9-2 at 44 (AR 43). Timothy R. testified as to several of his past occupations and how his diabetes and neuropathy impacted them. Filing 9-2 at 46-54 (AR 45-53). He testified that he failed his DOT examination for his delivery driver job due to his uncontrolled diabetes. Filing 9-2 at 48 (AR 47). He testified that his diabetic control has been an issue since 2007 and caused his past relevant work to be very difficult. Filing 9-2 at 54 (AR 53). He further testified that he lost some of those jobs because of his diabetes, stating, "[A] good example is when I went to [a] job one day, I had an episode where I passed out. My [blood] sugar was like really low, and they let me go because I was too much of a liability." Filing 9-2 at 54 (AR 53).

Timothy R. testified that his diabetes had "been this bad" for the decade leading up to the hearing, but that recently his A1c has been dropping and his neuropathy symptoms have been

getting worse. Filing 9-2 at 54-55 (AR 53-54). He testified that he feels the neuropathy in his hands and his feet, but that his feet get the worst of it. Filing 9-2 at 55 (AR 54). Timothy R. testified that he could stand or walk for about five minutes before his legs go completely numb and he sometimes falls. Filing 9-2 at 56 (AR 55). Timothy R. testified that when he uses his hands, it hurts "when I'm like raising my arms quite a bit and like caressing my dog." Filing 9-2 at 57 (AR 56). He testified that he takes medication for his neuropathy, and it makes him sleepy. Filing 9-2 at 57 (AR 56).

Timothy R. testified that for the past five or six years, his anxiety affects him in terms of working as he "get[s] irritable" and both crowds and dealing with people in person trigger his anxiety. Filing 9-2 at 57 (AR 56). He testified that regarding his anxiety, "I've talked to my doctor about it, but she hasn't said nothing really about it. Like giving me medication or nothing." Filing 9-2 at 57-58 (AR 56-57). He testified that he sits on a stool to do the dishes, drives, does not do any outside chores, shops at the store if there is a motorized cart available, his wife manages their finances, and he only goes to social events that are family functions. Filing 9-2 at 58-59 (AR 57-58).

Timothy R. also testified that he is computer illiterate, has a learning disability, and "wasn't really good at" dealing with customers. Filing 9-2 at 60 (AR 59). He testified that because of his learning disability he was enrolled in special education classes in school. Filing 9-2 at 60 (AR 59). He also testified that he would be able to read his attorney's brief, but it would take about an hour to read it, and he would have to go over it five or six times. Filing 9-2 at 60-61 (AR 59-60). He testified that his wife helped him fill out the disability forms. Filing 9-2 at 61 (AR 60).

Timothy R. testified that if he were to be on an assembly line using his hands regularly, "they would go numb quite fast." Filing 9-2 at 60 (AR 59). He testified that he could not use his

9

hands to open new bottles, jars, or screw lids generally. Filing 9-2 at 61 (AR 60). He testified that he could use a knife but not most other tools. Filing 9-2 at 61 (AR 60). He reported that his doctor recommended that he get a cane, but the doctor did not give him a prescription for one. Filing 9-2 at 61 (AR 60). He testified that he gets fatigued and lies down for a couple of hours each day, during which he falls asleep. Filing 9-2 at 62 (AR 61). He testified that he can take care of his own personal care but may need help with doing up buttons occasionally. Filing 9-2 at 62-63 (AR 61-62). He testified that he has a grab bar installed in his bathroom for getting up from the toilet. Filing 9-2 at 63 (AR 62). In response to a question from the ALJ, Timothy R.'s attorney represented that the only comment in the medical records about Timothy R.'s hands is neuropathy. Filing 9-2 at 63 (AR 62). Timothy R. testified that his neuropathy started around 2020 or 2021. Filing 9-2 at 65 (AR 64).

### 4.  The ALJ's Findings

The ALJ determined Timothy R. had not been engaged in substantial gainful activity from the alleged onset date of June 1, 2022. Filing 9-2 at 26 (AR 25). While there is evidence in the record that Timothy R. worked as a delivery driver past that date, the ALJ considered that to be an unsuccessful work attempt. Filing 9-2 at 37 (AR 66). The ALJ proceeded to the next step of the analysis. The ALJ also determined that Timothy R's type 1 diabetes mellitus with diabetic polyneuropathy was severe. Filing 9-7 at 26 (AR 25). The ALJ determined that Timothy R.'s TIA, right fourth toe amputation, and anxiety disorder were non-severe. Filing 9-7 at 27 (AR 26). The ALJ observed that nowhere in the record was there an indication that any residuals of the TIA were expected to last a continuous period of 12 consecutive months. Filing 9-2 at 27 (AR 26). The claimant was able to engage in substantial gainful activity after the amputation of his toe. Filing 9-2 at 27 (AR 26); and "[b]ecause the claimant's medically determinable mental impairment causes no more than 'mild' limitation in any of the functional areas and the evidence does not

10

otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, it is non-severe." Filing 9-2 at 28 (AR 27). In contrast, the finding of the DM1 with polyneuropathy as severe permitted the ALJ to proceed to step three.

The ALJ did not find that any of Timothy R.'s impairments or combination of impairments met the listed criteria under 20 C.F.R. Pt. 404, Subpt. P, App. 1, so the ALJ therefore proceeded to step four of the analysis to determine whether Timothy R. could work with his RFC. Filing 9-2 at 29 (AR 28). The ALJ concluded the following pertaining to Timothy R.'s RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the following limitations: he is able to frequently perform handling, fingering, and feeling. The claimant can never climb ladders, ropes, or scaffolds. He is able to occasionally climb stairs or ramps, balance, stoop, kneel, crouch, and crawl. The claimant can tolerate occasional exposure to extreme hot or cold temperatures and hazards (such as unprotected heights and moving mechanical parts).

Filing 9-2 at 29 (AR 28).

The ALJ determined that Timothy R. was "unable to perform his past relevant work as it is actually or generally performed because the requirements exceed his residual functional capacity for sedentary work." Filing 9-2 at 34 (AR 33). This determination was based on the VE's testimony. Filing 9-2 at 31 (AR 33). In response to the ALJ's hypothetical question explaining Timothy R.'s age, education, work experience and RFC, the VE cited three occupations she believed Timothy R. would be able to perform which exist in significant numbers of the national economy. Filing 9-2 at 35 (AR 34). These occupations consist of "Order clerk, food and beverage (DOT# 209.567-014) with 15,700 such jobs in the national economy; Charge account clerk (DOT# 205.367-014) with 36,900 such jobs in the national economy; or Polisher (DOT#713.687-034) with 10,500 such jobs in the national economy." Filing 9-2 at 35 (AR 34). The VE further testified that her opinion was consistent with the Dictionary of Occupational Titles (DOT) and based on

11

her professional experience. Filing 9-2 at 35 (AR 34). Basing his conclusion on the testimony of the VE, the ALJ found that Timothy R. was able to adjust to work that exists in significant numbers in the national economy. Filing 9-2 at 35 (AR 34). As a result, the ALJ found that Timothy R. was not disabled at step five of the disability determination. Filing 9-2 at 35 (AR 34).

## II. LEGAL ANALYSIS

### A. Standard of Review

A Social Security claimant must proceed through four levels of administrative review, including an Appeals Council review of the ALJ's decision, before the claimant may obtain judicial review in federal district court. *Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019); *see also* 42 U.S.C. § 405(g). Once at the federal district court level, the court will "decide whether the [ALJ]'s findings 'are supported by substantial evidence on the record as a whole.'" *Bowers v. Kijakazi*, 40 F.4th 872, 874 (8th Cir. 2022) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). "Substantial evidence [on the record as a whole] is less than a preponderance of the evidence" and is "'such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion.'" *Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016) (quoting *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014) (internal citations and quotations omitted)). "Substantial evidence in the record as a whole" is a more rigorous standard than simply "substantial evidence" since the former standard requires consideration of evidence that supports or detracts from the ALJ's determination, whereas the latter does not. *Schmitt v. Kijakazi*, 27 F.4th 1353, 1358 (8th Cir. 2022) (quoting *Koch v. Kijakazi*, 4 F.4th 656, 663 (8th Cir. 2021) (cleaned up and internal quotations omitted) ("Substantial evidence in the record as a whole" is a more "rigorous" standard than simply "substantial evidence," which is "evidence that a reasonable mind might accept as adequate to support the Commissioner's conclusion.")). The district court "will not reverse the [ALJ]'s decision merely because [the court] find[s] that 'substantial evidence exists

12

in the record that would have supported a contrary outcome.'" *Austin v. Kijakazi*, 52 F.4th 723, 728 (8th Cir. 2022) (citing *Schmitt*, 27 F.4th at 1358) (internal quotations omitted)). Rather, "'[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Dols v. Saul*, 931 F.3d 741, 744 (8th Cir. 2019) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

Additionally, the district court must determine whether the ALJ's decision "complies with the relevant legal standards." *Lucus v. Saul*, 960 F.3d 1066, 1068 (8th Cir. 2020) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (internal citations omitted)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." Id. (quoting *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011), in which the ALJ committed legal error by not posing a hypothetical question to the vocational expert). "In conducting [the] limited and deferential review of the final agency determination under the substantial-evidence standard, [a court] must view the record in the light most favorable to that determination." *Dols*, 931 F.3d at 748 (quoting *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam)).

### B. Discussion

Timothy R. asserts two grounds for reversing and remanding the ALJ's decision. First, Timothy R. argues that the ALJ erred by failing to account for each of his impairments with no reason for ignoring evidence favorable to Timothy R.'s assertion of disability. Filing 17 at 10. Second, Timothy R. asserts that the ALJ made a legal error by rejecting the State Consultant's opinions based on vocational ambiguity rather than an evaluation of supportability and consistency. Filing 17 at 13.

1.  *The ALJ's RFC Determination Was Supported by Substantial Evidence*

a.  The ALJ Gave Proper Consideration to Mental Impairments

Timothy R.'s first contention is that the ALJ's decision is not supported by substantial evidence where the ALJ failed to account for Timothy R.'s mental health limitations[4] without citing a reason for the omission of favorable evidence. Filing 17 at 10. Timothy R. contends that pursuant to Social Security Ruling ("SSR") 96-8p, an "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p. Filing 17 at 10-11. Timothy R. argues that the ALJ failed to consider any mental impairment after step two, as required by SSR 96-8p, and therefore his decision is not supported by substantial evidence and requires reversal. Filing 17 at 13.

When evaluating the severity of a claimant's mental impairments at step two, an ALJ must first "evaluate [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1). The ALJ "then rate[s] the degree of functional limitation resulting from the impairment(s)" in four broad functional areas known as the "Paragraph B" criteria. *See* 20 C.F.R. § 404.1520a(b)(2). As correctly noted by the ALJ, the criteria are as follows: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. § 404.1520a(c)(3); Filing 9-2 at 22–23 (AR 21–22). The ALJ rates the criteria using a five-point scale of none, mild, moderate, marked, and extreme.

---

[4] In addition to Timothy R.'s mental health impairments, Timothy R. makes a brief argument that the ALJ failed to account for the "combined impact of Plaintiff's osteoarthritis and obesity." There is no mention of either of these impairments in the Administrative Record nor did Timothy R. ever allege this combination of impairments in his complaint. This seems to be a proofreading error on the part of the attorney, and if it is not simply an error, it serves only to confuse the reader. Filing 17 at 11.

*See* 20 C.F.R. § 404.1520a(c)(4). If the ALJ rates the claimant's mental impairments as "none" or "mild," then the ALJ will generally conclude that the mental impairments are non-severe, unless the evidence indicates there is more than a minimal limitation in the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520a(d)(1).

At step two, the ALJ determined that Timothy R. has self-reported feeling anxious in large crowds of people or when dealing with people, and panic attacks in the past, although he was not treated with medication or therapy. Filing 9-2 at 27 (AR 26). Therefore, the ALJ concluded that Timothy R.'s "medically determinable mental impairment causes no more than 'mild' limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, [so] it is non-severe." Filing 9-2 at 28 (AR 27). Notably, Timothy R. makes no claim that the ALJ improperly categorized his mental impairment as non-severe in step two; rather, he argues that the ALJ erred because he failed to consider the impacts of Timothy R.'s non-severe mental impairments in the RFC. Filing 17 at 11.

"At the fourth step, the ALJ assesses the claimant's RFC and considers whether the claimant can do his past relevant work based on his RFC." *Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016); *see* 20 C.F.R. § 404.1520(e). "RFC is defined as the most a claimant can do despite his limitations, including both physical and mental limitations." *Hensley v. Colvin*, 829 F.3d 926, 931 (8th Cir. 2016); 20 C.F.R. § 404.1545. "The ALJ's RFC assessment must be based on 'all the relevant evidence in [the] case record.'" *Igo*, 839 F.3d at 730 (citing 20 C.F.R. § 404.1545(a)). "Even 'non-severe' impairments must be considered in the RFC." *Igo*, 839 F.3d at 730 (citing *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)). "In evaluating the ALJ's RFC assessment, '[a court] consider[s] all of the evidence that was before the ALJ, but [does not] re-weigh the evidence,

15

and defer[s] to the ALJ's determinations regarding the credibility of witnesses so long as such determinations are supported by good reasons and substantial evidence.'" *Igo*, 839 F.3d at 730 (citing *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005)).

After careful consideration of the record taken as a whole, the ALJ determined that the record did not warrant the inclusion of mental limitations in the RFC:

> [T]he psychological Consultative Examiner opined that the claimant is able to understand and carry out simple instructions, with no difficulty concentrating and sustaining attention as required to complete tasks. Dr. Berryman further opined that the claimant is able to relate appropriately to co-workers and supervisors and adapt to changes in his environment.
>
> The Consultative Examiner's opinion is persuasive. It relies on evidence from the claimant's mental status examination, such as the absence of clinical signs of anxiety in his affect or psychomotor behavior, the claimant's intact memory and cognition, and intact judgment. The opinion is also consistent with the evidence that the claimant does not treat with medication or therapy and his reported activities of daily living of shopping in stores or attending church and the claimant's previous denial of difficulty getting along with others. For these reasons, the undersigned finds the Consultative Examiner's opinion persuasive.
>
> The State agency psychological consultants opined that the claimant would have no difficulty understanding and carrying out simple instructions or adapting to changes in his environment. It is reasonable that the claimant would be mildly limited in his interactions with the general public, although that was not translated into a vocational restriction.
>
> The undersigned finds these opinions somewhat persuasive. The ambiguity created in the discussion of the claimant's anxiety in large crowds, without signs of erratic behavior, and his mild limitations in public diminishes the persuasive value of the opinions. The general conclusion that the claimant's symptoms are mild in nature are supported by the evidence discussed in the opinions of his performance at the Consultative Examination. The opinions appear consistent with the claimant's normal mental status examinations on other occasions as well. Overall, however, the undersigned cannot find the opinions more persuasive because they do not adequately articulate the claimant's limitations or retained abilities for use in a residual functional capacity assessment.

Filing 9-2 at 33-34 (AR 32-33) (internal citations omitted).

The fact that the ALJ concluded in step two that Timothy R.'s mental impairments were "mild" does not mean that the RFC must include mental functioning limitations. *Jean P. v.*

*Kijakazi*, 8:21-CV-200, 2022 WL 1505797 at *7 (D. Neb. May 12, 2022) (citing *William G. Long JR., v. Comm'r of Soc. Sec.*, No. CV 20-1358-MN, 2022 WL 609620 at *7 (D. Del. Jan. 31, 2022)) ("Although an ALJ must consider limitations imposed by all of an individual's impairments, both severe and non-severe, when making their RFC assessment, there is no requirement that an ALJ must find or include limitations associated with mild impairments."). Instead, it merely requires that the ALJ assess these non-severe mental impairments when determining the subsequent RFC. The ALJ's step two and four analyses fit together in harmony. At step two the ALJ determined that Timothy R. has mild limitations that the ALJ considered in his step four analysis, concluding that Timothy R. was able to adapt to work within the RFC. *See Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam) ("[W]e must strive to harmonize [ALJ's] statements [at the different steps] where possible"). Here, the ALJ did not err.

   b.   The ALJ's Conclusion Is Properly Supported

Timothy R. argues that because the ALJ did not consider his mental impairments in the RFC analysis he did not construct what a district court in this circuit called a "logical bridge" between the evidence and the conclusion. Filing 17 at 12 (quoting *Holdeman v. Kijakazi*, Case No. 20-cv-729-NKL, 2021 WL 6062368, at *4 (W.D. Mo. Dec. 22, 2021)). Indeed, Timothy R. asserts, "Without some explanation or recognition of Plaintiff's mental impairment after Step Two, it is hard to believe that the ALJ constructed *any* bridge, much less a logical one." Filing 17 at 12 (emphasis in the original). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). However, an ALJ need not obtain a functional description that "wholly connects the dots" between medical evidence and the precise limitations of the claimant's functionality, but something is needed beyond the ALJ's inferences. *Noerper*, 964 F.3d at 746.

17

Nevertheless, the RFC is mostly created from medical evidence, and the RFC remains "an administrative decision reserved to the [SSA]." *Montgomery v. O'Malley*, 122 F.4th 1059, 1064 (8th Cir. 2024) (alteration in original) (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)); *see* 20 C.F.R. § 416.946(a). It is hard to understand how Timothy R. cannot use the ALJ's reasoning to connect the evidence cited above by the ALJ to the finding that there is no mental limitation required in the RFC. The medical records show that substantial evidence supports the ALJ's decision to exclude mental limitations in the RFC.

Timothy R. also suggests that the ALJ excluded limitations cited by both of the state psychological consultants, arguing that they found, "Plaintiff's mental health impairment was severe and that he had moderate limitations in his ability to interact with others." Filing 17 at 11. Here, Timothy R. attempts to use checklist determinations that do not explain any actual limitations as proof of a necessary limitation on the RFC. As explained more fully in the next subsection, this evidence is refuted by the state consultants' own conclusions and is ambiguous as to vocational restrictions, which the ALJ appropriately points out in his RFC determination.

### 2. The ALJ Correctly Evaluated the Opinions of the State Psychological Consultants

Timothy R next argues that the ALJ erred by finding the State Psychological Consultants' opinions to be somewhat persuasive but rejecting their opinions about any limitations interacting with others. Specifically, he argues that the ALJ erred by rejecting part of the Consultants' opinions for being vocationally ambiguous, rather than doing a proper evaluation of supportability and consistency. Timothy R. uses this conclusion to argue that the ALJ had a duty to contact the state agency psychological consultants for further clarification of their ambiguous opinions.

a. Ambiguity Is a Valid Reason to Discount an Opinion in Determining the RFC

Timothy R. argues in the case at hand that the ALJ, "improperly rejected the opinion of the state agency psychological consultants on the basis that their functional limitations were vague." Filing 17 at 14. An ALJ "has the discretion to discount a medical opinion . . . due to its vagueness or ambiguity." *Jessica Lynn J. v. Comm'r of Soc. Sec.*, —— F. Supp. 3d ——, 2022 WL 17494109, at *5 (W.D.N.Y. 2022); *Brian E. v. Kijakazi*, No. 22-cv-372, 2023 WL 21920, at *2 (D. Minn. Jan. 3, 2023) ("[D]istrict courts have continued to find that ALJs are entitled to discount vague medical opinions under the post-2017 standard."). In this case vagueness was an appropriate reason to find the opinions of the state psychological consultants only somewhat persuasive, as the ALJ found that the opinions failed to explain any limitations they suggested. *Jeana K. v. Bisignano,* No. 25-cv-3092 2025 WL 3683120, at *17 ("[Vagueness] was an acceptable reason to find Dr. Phillippi's opinion less persuasive as it indicated that Dr. Phillippi's opinion contained less relevant 'supporting explanations' and therefore less supportability" (quoting *Brian E.*, 2023 WL 21920, at *2 (D. Minn. Jan. 3, 2023))).

b. The ALJ Was Not Required to Develop the Record Further.

Timothy R. argues that the ALJ improperly rejected the state psychological consultants' opinions for being vague and did not contact them for further clarification. Filing 17 at 14. 20 C.F.R. § 404.1519p(b) provides, "If the report is inadequate or incomplete, we will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report." Timothy supports his argument with three cases where the district court remanded because the ALJ improperly rejected opinions in the medical record and further clarification was needed. Filing 17 at 13-15; Filing 24 at 2-3.

19

These cases are distinguishable from the one at hand. Timothy R. makes the same mistake here as a claimant in *Benjamin R. v. Commissioner*: "[C]ontrary to Benjamin's assertion, the ALJ did not 'reject' Dr. Toor's opinion; rather, the ALJ simply observed that the opinion would have been more persuasive had it included more specific functional limitations." *Benjamin R. v. Comm'r of Soc. Sec.,* No. 6:21-CV-06109-LJV 2024 WL 5094616. Here, the ALJ likewise did not reject the opinions of the state psychological consultants – as Timothy R. suggests – and instead found them to be persuasive as far as they were supported by and consistent with the medical records, but like the ALJ in *Benjamin* he could not "find the opinions more persuasive because they do not adequately articulate the claimant's limitations or retained abilities for use in a residual functional capacity assessment." Filing 9-2 at 34 (AR 33). Additionally, the ALJ in this case was not required to contact anyone for clarification because the medical record did not lack clarity and the ALJ was able to make a proper assessment with the information therein.

c. The ALJ Relied on Supportability and Consistency in his Determination

Timothy R. further asserts that the ALJ did not do a proper analysis of supportability or consistency in evaluating the consultants' opinions. Filing 17 at 15. The ALJ is required to "articulate in [his] determination of decision how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings" according to various factors. *See* 20 C.F.R. § 404.1520c(b). The factors for consideration include supportability, consistency, relationship with the claimant, specialization, and others. *See* 20 C.F.R. §404.1520c(c). "The factors of supportability . . . and consistency . . . are the most important factors" to be considered when evaluating the persuasiveness of a medical opinion." *See* 20 C.F.R.§ 404.1520c(b)(2). Accordingly, the ALJ is required to explain how he or she "considered the supportability and consistency" of a medical opinion in his or her decision. Id. However, the ALJ need not use the

words "supportability" and "consistency" in making his or her determination so long as it is clear the factors were addressed. *See, e.g.*, *Atwood v. Kijakazi*, No. 4:20-CV-1394, 2022 WL 407119, at *5 (E.D. Mo. Feb. 10, 2022) ("The fact that the ALJ did not use the words 'supportability' and 'consistency' is not determinative; word choice alone does not warrant reversal." (citing *Kamann v. Colvin*, 721 F.3d 945, 951 (8th Cir. 2013))).

This court recently addressed a similar issue and held, "Although the ALJ does not use the word 'consistency,' her finding that the opinions are 'only partly persuasive' is predicated on a supportability and consistency analysis." *Jeana K. v. Bisignano,* No. 25-cv-3092 2025 WL 3683120, at *16 (D. Neb. Dec. 19, 2025). In this case, there is no issue of the ALJ not using the word "consistency." Filing 9-2 at 34 (AR 33). He found that the general conclusions of the opinions at issue were supported by and consistent with the record and the consultative examination of Timothy R. Filing 9-2 at 34 (AR 33). The inconsistency of specific limitations that matched the vague opinions prompted the ALJ to find that the opinions were not fully supported by the medical records and therefore found the opinion to be only somewhat persuasive. Filing 9-2 at 34 (AR 33). Much like the ALJ in *Jeana K.*, the Court finds that this ALJ's finding regarding the somewhat persuasive opinions was predicated on a supportability and consistency analysis.

### III. CONCLUSION

The Court concludes that substantial evidence supports the ALJ's decision that Timothy R. is not disabled. Accordingly,

IT IS ORDERED that

1.    Timothy R.'s Motion for an Order Reversing the Commissioner's Decision, Filing 17, is denied;

2.    Bisignano's Motion to Affirm the Commissioner's Decision, Filing 21, is granted;

3.    The Commissioner's decision is affirmed;

4.    The Court will enter a separate judgment.


Dated this 30th day of June, 2026.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge